### THE OLYMPIA.

(District Court, S. D. Florida. 1909)

SALVAGE (§§ 15, 18*)—RIGHT TO COMPENSATION—JETTISON OF CARGO OF STRANDED VESSEL.

The Mexican steamship Olympia, with a cargo of coal, stranded on a Florida reef. She put out two anchors astern to act as kedges before the falling of the tide, and her master refused offers of assistance from libelants' vessels which arrived. Afterward the master of a pilot boat, in uniform, boarded the steamer, and as the evidence tended to show, claimed to the master, who knew very little English, that he was an officer with authority to assist the vessel and ordered men from libelants' vessels to jettison cargo, which they proceeded to do. Subsequently the Olympia broke one of her hawsers in attempting to pull off, and had to be assisted by a revenue cutter which appeared. *Held*, that there was no ground for the recovery by libelant of ordinary salvage compensation, but that as it appeared that the lightening of the vessel by reason of the coal jettisoned was of benefit and perhaps necessary in floating her, the men who did the work were individually entitled to recover reasonable compensation therefor.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 28, 31–43; Dec. Dig. §§ 15, 18.*]

In Admiralty. Suit by one Sawyer and others against the steamship Olympia. Decree for libelants.

Geo. W. Allen and L. W. Bethel, for libelants.
G. Browne Patterson, for respondent.

LOCKE, District Judge. It appears from the testimony in this case that the Mexican steamship Olympia, loaded with about 1,200 tons of coal from Norfolk to Vera Cruz, ran ashore on the Florida reef in March, 1908. The master immediately prepared to run his two anchors, one of about 2,000 and one of about 2,500 pounds, by slinging them from his large boats, and endeavoring to have them towed into deep water; but the wind being against him he found it difficult to make progress, and there being a launch of about 14 tons in sight, he signaled to it to come to his assistance, and having sounded and found a place where the water was sufficiently deep to let go the anchors, had his boats towed out and the anchors dropped, bringing the

hawser to the after chocks and carried to the winches of the steamer, and a heavy strain hove until the falling of the tide. In the meantime several schooners of the libelants arrived at the steamer, but upon application being made for permission to come aboard, were denied. Finally a pilot boat, with its master, Pierce, dressed in a uniform with brass buttons, four gilt stripes on his sleeves and a uniform cap with gilt letters ".C. P.," came alongside, and he was permitted to come on board. From this time on the testimony is conflicting.

There is no question in my mind that the captain of the steamship considered and believed that the person in uniform was some official character, and no doubt the pilot endeavored by all means within his power to represent himself in that capacity. He admits he told the captain of the steamship that he was the "commodore of the port." The testimony of many witnesses is that he informed the captain that his duty was to protect and save vessels on the reef, and declared his right and powers, and insisted upon his authority to assist the vessel. This is not only testified to by the master and crew of the steamer, but also by the crew of the launch that carried out the anchors. The master of the steamer understood English but slightly—not well. There is no question in my mind that he told the pilot that he did not require any more assistance; that he had his anchors out and could get his vessel afloat by the next tide; but that Pierce insisted upon his being permitted to bring his men on board and lighten the steamer, and I am satisfied that he instructed them to come on board without permission of the master. It appears from the testimony of Pierce himself that he could not talk with the captain without an interpreter, and before he had any conversation that amounted to anything he states that he found one of the crew of one of the libelant vessels who was then on board, to act as interpreter. I am satisfied by this that this interpreter came on board with the rest of the men before Pierce had a conversation with the master through an interpreter. Pierce insisted on his right to jettison coal in order to float the vessel. Just the conversation that actually took place between the master and Pierce is very difficult to determine, and although Pierce states that his interpreter was an American belonging to one of the vessels engaged in the salvage service, he has not been produced or his name furnished to the court so that he might be found. After Pierce had ordered the crews of the wrecking boats to come on board, one Sawyer, master of one of the vessels, was directed by him to go to work and open the hatches and commence jettisoning cargo. He inquired of Pierce what agreement had been made, but the only answer he received was, "It's all right—go ahead." It is testified to by Sawyer that the second mate and some of the crew of the vessel assisted in opening the hatches. This the first and second mates both deny, and they state that everything they permitted to be done was permitted by reason of the orders of the officer in uniform. In the meantime about 16 man belonging to the libelants' vessels came on board and commenced to throw coal overboard. Sawyer continued the work; but he was not satisfied at that time that any arrangement or agreement had been made with the master, and continued to attempt to get some understanding with him about continuing work; but it does

not appear that he was given any instructions, but was told to go to the first mate. He has testified that the first mate instructed him to continue jettisoning coal, but the first mate denies that he did, but says that all the coal jettisoned was jettisoned by what he considered the authority of the man in uniform. At the next high tide, while heaving upon the anchors, the vessel was moved slightly, but the large hawser to one anchor parted and the other anchor dragged. The weather became rougher, and, on account of the vessel pounding and loosening the supports of the boilers, it became necessary to shut off the steam and draw the fires—when the jettison of coal continued until there had been about 50 to 75 tons thrown overboard, lightening the steamer somewhat. In the morning the revenue cutter, which had arrived, was called upon, and after towing from a half hour to an hour, according to the conflicting testimony, the steamer floated. While it is considered that the libelants who came on board by instructions of Pierce, the pilot, so came on board and went to work without the voluntary consent of the master, and were only permitted to do so by the mistaken belief of Pierce's authority, yet unquestionably they personally acted in good faith. Whether such services as they rendered were of any benefit to the property so as to entitle them to any compensation becomes the important question in the case. There was no contract or agreement, and the circumstances under which the work was commenced and carried on, some of which it is unnecessary to review here, precludes the idea of any ordinary salvage compensation; yet it is considered that if the property was benefited by their labor, they may in justice be entitled to a quantum meruit.

In determining whether their labor was of any such benefit, the changes which have taken place since their services were refused and before the vessel was floated, may be considered. At the time of refusal there were two large anchors laid out in good position, the steam power of the vessel was in good condition, and the master had good reason for refusing aid; but subsequently one hawser parted, the other anchor dragged, and on account of heavy pounding the steam power had to be given up and the fires drawn. It is therefore considered that although at the time the assistance was first declined there was no apparent need of further aid, the probability is that the amount which the jettison of cargo had lightened the vessel, very materially assisted the revenue cutter in floating her and probably saved a tide and perhaps the vessel; and that such probability is sufficient to allow the men who actually performed the labor a quantum meruit for such labor. There were about 20 men, rather less than more, and they worked from 8 to 10 hours, and it is considered that $100 will fairly compensate them. The large number of vessels, and men who were on board of them, named in the libel, rendered no service and were of no benefit whatever. None of the libelants were licensed wreckers of this district, and were under no obligations to assist property.

A decree will follow for $100 to the actual parties who rendered services.